Van Yoobhis, J.
This is an appeal from a judgment of the Appellate Division, Third Department, affirming a summary judgment in favor of plaintiffs, entered upon an order of the New York County Special Term. The appeal in the Appellate Division was transferred to the Third Department by the First Department. The judgment under review is a declaratory judgment, determining that the Appellate Division, First Department, lacked power to adopt a rule relating to “ Contingent Fees in Claims and Actions for Personal Injury and Wrongful Death.”* The record on appeal discloses that in *102 recent years contingent fee agreements have been filed with the Clerk of the First Department at an annual rate of 150,000 or more, of which upwards of 60% have fixed the attorneys’ compensation at 50% of the amount of the recovery. Ninety-five per cent of the actions brought have been settled and not more than one and one-half per cent of all claims of this nature have gone to judgment after trial. Canon 13 of the Canons *103 of Ethics of the New York State Bar Association provides: “ A contract for a contingent fee, where sanctioned by law, should be reasonable under all the circumstances of the case, including the risk and uncertainty of the compensation, but should always be subject to the supervision of a court, as to its reasonableness.”
Taking cognizance of this situation, and noting that contingent fees are generally allowed in the United States because of their practical value in enabling a poor man with a meritorious cause of action to obtain competent counsel, the First Department adopted rule 4 with a preamble which concludes:
“ When, however, the contingent fee reaches or approaches the 50 per cent level, it ceases to be a measure of due compensation for professional services rendered and makes the lawyer a partner or proprietor in the lawsuit. This is not a permissible professional relationship or a proper professional practice.
“ The court considers the schedule adopted to allow ample compensation for the best efforts and services of competent counsel. It recognizes the possibility that extraordinary circumstances may exist in a particular case which would make the resulting compensation inadequate. The court will make special allowance in such cases and grant an application for larger compensation.”
The complaint does not attack the reasonableness of this rule or its need. One of the plaintiffs’ moving affidavits states: “ Whether the Rule is good or bad, necessary or unnecessary, desirable or undesirable, fair or unfair, responsive or not to the ethical and moral standards of the community, serving or damaging to professional and public interests, it is our contention that the Appellate Division was without power to adopt the Rule and is without power to enforce it.”
Plaintiffs have not put in issue and have thus recognized for the purposes of the action that the rule is good, necessary, desirable, fair, responsive to the ethical and moral standards of the community and serving professional and public interests. The power to adopt the rule is challenged, but the question of power has to be decided in the light of these circumstances. The issues before us have been drawn in this manner by the parties.
*104 This rule was held to he invalid by the Third Department upon two grounds: (1) that it is inconsistent with section 474 of the Judiciary Law providing that the compensation of an attorney is governed by agreement, and (2) that the Appellate Division lacks power of discipline over attorneys regarding excessive fees except “in the individual case and after the event. ’ ’ Mention is not made in the Appellate Division’s opinion of any other ground in the opinion at Special Term, such as that the rule is one of substantive law applying to only a segment of the State, or that disciplinary power over attorneys is unrelated to how much they charge their clients. Special Term did recognize that there may be such a thing as an “unconscionable ” contingent fee agreement, but remarked that this must be decided as a question of fact whereas rule 4 is said to establish it as a matter of law.
Special Term’s criticism of the rule on the ground that it establishes substantive law applicable to but one segment of the State will first be considered. If this comment were well founded, it would be a fatal defect—the Appellate Divisions cannot make substantive law by rules, and, acute as the problem is in the metropolitan counties, it could hardly be held that the attorney and client relationship is governed by different substantive law in New York City or in different parts of New York City. Upon the other hand, if rule 4 does not change the substantive legal relation between attorney and client, but merely supplies a procedure for determining on the basis of the real facts whether a lawyer is subject to discipline for charging more than he could collect in court from his client under law applicable to every part of the State, rule 4 was properly adopted under section 83 of the Judiciary Law, which enables a majority of the Justices in each Department to make rules not inconsistent with any statute or rule of civil practice. The rules that have been adopted in the different Departments show that within these limits rules regarding procedure or disciplinary matters do not have to be uniform in all Departments, just as investigations of attorneys may be conducted in one Department without being conducted in others (People ex rel. Karlin v. Culkin, 248 N. Y. 465).
It has been held by the judgment appealed from that rule 4 purports to alter the substantive law governing the relation *105 ship between attorney and client, and that in doing so it conflicts with section 474 of the Judiciary Law insofar as section 474 states that the compensation of an attorney is governed by agreement, express or implied.' The Appellate Division, Third Department, and Special Term have both started with the assumption that rule 4 threatens disciplinary action against lawyers who make retainer agreements with clients that would otherwise be valid and enforcible under section 474 of the Judiciary Law. If follows from this false premise that the effect of rule 4 is to regulate fees of attorneys differently from the way in which they are regulated by statute. We find no basis for this assumption in the language of the rule, in its preamble, or in the evil which it proposes to remedy. The rule does not touch lawyers’ fees except such as would be unenforcible in any event under section 474 of the Judiciary Law. It has been implied that rule 4 prevents lawyers from charging clients what they could otherwise legitimately charge, but that assumption overlooks that disciplinary action is not threatened except against exacting fees which could not legally be enforced in the absence of rule 4. Of course the threat of disciplinary action inhibits charging more than would be sanctioned under the rule, but that is not the test of its validity. That would have been true if the rule had simply announced that lawyers would be subject to disciplinary action for charging unconscionable fees. If the rule is limited, as we interpret it, to making provision for disciplining attorneys for receiving more from their clients than could legally be collected under retainer agreements, even with the aid of section 474 of the Judiciary Law, the judgment appealed from is without foundation. The standard of decision in disciplining a lawyer or in announcing that he will be subject to discipline for violation of this rule, is whether he has charged his client more than the client is legally obligated to pay—that is to say, has charged what the courts will refuse to enforce as unconscionable in amount under a contingent fee agreement made with all the support which section 474 can supply.
It is not necessary to enter into an elaborate historical discussion of the origin of section 474 of the Judiciary Law. On the adoption of the Field Code (Code of Pro.; L. 1848, ch. 379), and under successor statutes culminating in the present section *106 474 of the Judiciary Law, contingent fee contracts ceased to be outlawed (are “ not restrained by law ”), but the courts have continued to exercise a wary supervision over them. The retention of such supervision by the courts was acknowledged by the New York State Bar Association in adopting Canon 13 of Ethics in 1909, in force ever since, which states that a contract for a contingent fee “ should always be subject to the supervision of a court, as to its reasonableness.” The State Bar Association did not act in ignorance or in contravention of the law of the State. Notwithstanding section 474, which was in effect during all of that time, few propositions are better established than that our courts do retain this power of supervision. Contingent fees may be disallowed as between attorney and client in spite of contingent fee retainer agreements, where the amount becomes large enough to be out of all proportion to the value of the professional services rendered. It matters little whether under such circumstances the formula be that the size of the fee becomes “ unconscionable ” or “ unreasonable ”. Each word means the same thing in this context. The special quality of a retainer contract is recognized by the cases holding that in spite of section 474 of the Judiciary Law the client may terminate it at any time, leaving the lawyer no cause of action for breach of contract but only the right to recover on quantum meruit for services previously rendered (Matter of Dunn, 205 N. Y. 398; Martin v. Camp, 2.19 N. Y. 170). Section 474 confers upon the lawyer no inalienable right to impose on his client, and a retainer agreement becomes unenforcible in some situations where a contract would be enforcible if the parties to it were not attorney and client. In Ransom v. Ransom (147 App. Div. 835, 849-850) the language of Justice Nathan L. Miller, later a Judge of this court, is quoted from McCoy v. Gas Engine & Power Co. (135 App. Div. 771, 772-773): “ The word ‘ unconscionable ’ has frequently been applied to contracts made by lawyers for what were deemed exorbitant font indent fees. But by that nothing more has been meant than that the amount of the fee, standing alone and unexplained, may be sufficient to show that an unfair advantage was taken of the client or, in other words, that a legal fraud was perpetrated upon him. (Morehouse v. Brooklyn Heights R. R. Co., 185 N. Y. 520.) ” In Matter of Friedman (136 App. Div. *107 750, affd. 199 N. Y. 537), where a contract for 50% of a recovery-in an accident case was held not to be fraudulent per se in all instances, the court added (136 App. Div. 751-752): “But the recovery may be such that what was in the first instance a fair contract becomes unfair in its enforcement. * * * the recovery may be such that the lawyer’s retention of it would be unjustified and would expose him to the reproach of oppression and overreaching. He is an officer of the court and is judged as such, and technical contractual rights must yield to his duty as such officer.” In the decisions on this subject, of which there are many, it is recognized throughout that there comes a point where the amounts to be received by attorneys under contingent fee contracts are large enough to be unenforcible under the circumstances of the case. Sometimes these charges are unconscionable as matter of fact and in other instances as matter of law (Ford v. Harrington, 16 N. Y. 285; Place v. Hayward, 117 N. Y. 487; Matter of Fitzsimons, 174 N. Y. 15; Morehouse v. Brooklyn Heights R. R. Co., 185 N. Y. 520; Matter of Friedman, 136 App. Div. 750, affd. 199 N. Y. 537, supra; Ward v. Orsini, 243 N. Y. 123). In the case last cited, an eminent lawyer presented to this court for approval his printed contingent fee agreement in a case where he claimed the modest sum of $300, due to the settlement of an action without his knowledge or consent against the New York Central Railroad Company. The reasonable value of the legal services rendered was easily $300, which amounted to 50% under the signed retainer agreement. The opinion notes (p. 129) that “ The defendant does not question the reasonableness of the fee.” In writing for the court, Judge Pound was careful to avoid setting a precedent for other cases saying (p. 128): “ It may well be that in a supposed case the amount received by the client would be so completely out of proportion to the value of the attorney’s services that it would be unconscionable as matter of law to permit him to enforce his contract.”
In Morehouse v. Brooklyn Heights R. R. Co. (supra, pp. 525-526) the court said: “ An agreement to pay an attorney one-half of the recovery where the action was to recover a penalty of fifty dollars would not by any person be considered to be improper, but if it was for fifty thousand dollars it might be considered quite improper.”
*108 If the effect of the controversial portions of rule 4 is to provide for the disciplining of attorneys only where the contingent fee would be uncollectible in the full amount in an action between attorney and client under the general law of the State without reference to rule 4—which an analysis of the rale indicates that it is—the rule is not subject to attack on the grounds that it is parochial or that it violates section 474 of the Judiciary Law. It is no answer to this reasoning that Surrogates’ Courts and courts dealing with infants’ claims or other cases may be vested with greater power to rule on lawyers’ fees than merely to decide whether they are so large as to be unconscionable.
Except for what is called the graduated fee schedule, it is improbable that anyone would take exception to what has previously been stated, any more than objection was taken in court to the rules requiring the filing of contingent fee retainers, the special deposit of moneys collected by way of settlement or judgment, the furnishing of detailed statements to clients or the preservation of attorneys’ records when rules concerning these were adopted in the First and Second Departments after the disclosures of the 1928 investigations (Matter of Bar Assn.of City of New York, 222 App. Div. 580; Matter of Brooklyn Bar Assn., 223 App. Div. 149; People ex rel. Karlin v. Culkin, 248 N. Y. 465, supra). Buies on those subjects prescribe in advance standards of conduct for attorneys in relation to their clients. There is no lack of power to do that, yet the reasoning of the opinions below would forbid it also. Bule 1-B of the First Department has long prescribed a standard of professional conduct directly respecting the compensation of attorneys, in that it prevents an attorney assigned as counsel for a defendant in a criminal case from accepting compensation except as authorized by an order of the court. That rule was attacked but was upheld in Matter of Dresnick (2 A D 2d 521). Section 308 of the Code of Criminal Procedure does not expressly authorize the Appellate Division to promulgate rule 1-B as respondents’ brief indicates. It was done under the rale-making power. Bule 4-Gr makes a violation of the standards prescribed in the other special rules grounds for a finding of professional misconduct within the meaning of subdivision *109 2 of section 90 of the Judiciary Law. There can be no objection to that.
Rule 4, sub judice, is essential in order to pnt on record the data necessary to be used as a foundation for taking disciplinary action. Even under plaintiffs’ theory of action, no objection would lie against the rule if every lawyer filing a contingent fee retainer agreement were also required to file in his closing statement the amount of time he devoted to the case and an enumeration of the other facts underlying the elements entering into the value of the lawyer’s services (Randall v. Packard, 142 N. Y. 47, 56). That would enable the court after the event and in the individual case to determine whether the lawyer was censurable for charging a contingent fee that was nnconscionable as being out of all relation td the value of the work performed. The “ fee schedule” in rule 4 dispenses with supplying that information where the agreed contingent fee is less than the percentages designated in the rule. If the stipulated fee is greater, the attorney is required to supply the information necessary on which to form a conclusion concerning the value of the professional services which have been rendered. This is merely supplying procedure whereby the lawyer may discharge his traditional burden of justifying his relations with his client where the circumstances prima facie call for explanation. Plaintiffs’ objections reduce themselves to the fact that a declaratory determination is to be made regarding whether the amount of the contingent fee is censurable before rather than after the lawyer has received it. Rule 4 does not call for any determination until after the services rendered by the lawyer have been completed, nor even then unless the contingent fee exceeds the amounts in the schedule. The direction in the rule that the determination is to be made after the professional services have been completed is not without power, due to the circumstance that the question of professional conduct is to be decided before rather than after the fee has been paid. Rules regulating professional conduct are ‘ ‘ to prevent the continuance ’ ’ of unworthy practices (People ex rel. Karlin v. Culkin, supra, p. 469). It is fairer and more considerate of the lawyer to determine the propriety of his conduct before he has received the fee.
If the consequence of the enforcement of this simple and practical disciplinary rule be to reduce the number of lawyers *110 who are charging unconscionable contingent fees, that can furnish no basis on which to impugn the rule as a fee regulating measure. All regulation of improper practices has its consequences or should have in curtailing the practices. That is the purpose. The practice of charging unlawful fees is bound to be curtailed by the exercise of disciplinary powers, whether the fees are found to be unconscionable before or after they are paid.
Subdivision 2 of section 90 of the Judiciary Law (formerly numbered § 88, subd. 2) is thus described in the opinion by Chief Judge Cabdozo for the unanimous court in People ex rel. Karlin v. Culkin (supra, pp. 471-472): “ ‘ The supreme court shall have power and control over attorneys and counselors-at-law ’ (Judiciary Law, § 88, subd. 2). The first Constitution of the State declared a like rule in terms not widely different. Provision was there made that ‘ all attorneys, solicitors and counselors at law hereafter to be appointed, be appointed by the court and licensed by the first judge of the court in which they shall respectively plead or practice; and be regulated by the rules and orders of the said courts’ (Constitution of 1777, § 27). What was meant by this provision that lawyers should be ‘ regulated by the rules and orders of the said courts? ’ Would the men who framed the Constitution of 1777 have been in doubt for a moment that a rule or order might be made whereby lawyers would be under a duty, when so directed by the court, to give aid by their testimony in uncovering abuses? We find the answer to these questions when we view the history of the profession in its home across the seas.”
After describing the English origins of these provisions, Chief Judge Cabdozo’s opinion in Karlin summarizes the constitutional and legislative history in this State (p. 477): “ With this background of precedent there is little room for doubt as to the scope and effect of the provision in the Constitution of 1777 that attorneys might bo regulated by rules and orders of the courts. The provision was declaratory of a jurisdiction that would have been implied, if not expressed. The next Constitution, that of 1821, was silent as to the whole subject, containing no reference either to regulation or to appointment. Promptly, to avoid misapprehension, the Legislature passed a statute, the act of April 17, 1823 (L. 1823, ch. *111 182, § 19), which continued in the same words the provision formerly contained in the Constitution of 1777. There was a revision of the statutes in 1827 (Act of Dec. 4,1827), in which the provision was omitted, but the courts continued to act upon the theory that the power of regulation was either inherent or implied (Matter of H., an Attorney, 87 N. Y. 521). The question does not now concern us whether the power may be withdrawn or modified by statute (Matter of Cooper, 22 N. Y. 67, 68). Instead of being withdrawn, it has been explicitly confirmed. In 1912, by an amendment of section 88 of the Judiciary Law (L. 1912, ch. 253), the jurisdiction was removed from the realm of implication. The earlier statutes were restored through a renewed declaration that lawyers are subject to the control and power of the court. We are back to the law as it existed in 1777.”
These broad rule-making powers, so recently and explicitly upheld, are ample and flexible enough to include rule 4. The rule-making power is not limited to prescribing only for the specific case after the event. The idea that imposition by lawyers on their clients, oppressive and unconscionable fee agreements or similar conduct is beyond the rule-making power of the court has no shadow of foundation. The idea is frivolous that disciplinary power over attorneys is unrelated to the exaction of excessive fees. Nor are the Appellate Divisions so helpless as to be denied the power of censure or of taking more incisive disciplinary action to curb the practice of excessive exactions against clients merely for the reason that the client himself has not elected to contest payment of the fee. The duty and function of the Appellate Divisions to keep the house of the law in order does not hinge upon whether clients, worn down by injuries, delay, financial need and counsel holding the purse strings of settlement, knowing little about law or lawyers, have had the stamina to resist in court by hiring other lawyers to be paid out of the other half of the recovery for defending against the first lawyer. This is not a picture of the courts and Bar as a whole in their relation to the public, but it accurately describes enough so that it cannot be said that the Appellate Division, First Department, has directed its attention without cause to correcting this situation. The independence of the Bar is not at stake in this action, nor are the best *112 interests of the profession served by growing public resentment engendered by what this rule is designed to prevent. While liability in the negligence field has been continually expanding and the size and proportion of recoveries has mounted in constantly increasing progression, the risk of the lawyer under contingent fee agreements has been reduced and his remuneration magnified. On top of this the percentages of the clients’ recoveries which this segment of the Bar insists upon the right to retain has been enlarged until in this one Judicial Department over 60% of the 150,000 contingent fee agreements filed each year provide that 50% of the recovery shall be paid to the lawyer.
Aware that when the contingent fee reaches or approaches 50% it ceases to be a measure of due compensation for professional services rendered and makes the lawyer a partner or proprietor in the lawsuit, the Appellate Division has sought a means of investigating and checking what it deems to be an improper professional practice in the great majority of instances where it occurs. It cannot be held that reasonable and effective disciplinary action is not demanded in order to prevent the exaction of more than lawful charges in this huge field of controversy and litigation.
Where the amount of the claim is small, as the preamble to rule 4 states, the percentage charged may be greater than where the recovery is larger without rendering the fee unlawful. As a practical approach the rule sets forth a tentative schedule, subject to variation if the facts warrant, characterizing as unreasonable and unconscionable the collection of contingent fees in excess of 50% on the first $1,000 of the sum recovered, 40% on the next $2,000, 35% on the next $22,000, and 25% on any amount over $25,000 of the sum recovered.* The preamble states that the court considers that ample compensation for the best efforts and services of competent counsel will ordinarily be provided by the schedule. It is not necessary to take judicial notice that it does so in most instances, for the reason that plaintiffs have not disputed for the purposes of the action that the rule is fair, responsive to the ethical and moral standards of the community and serves professional and public *113 interest. Moreover, what is of the utmost importance, these schedules are merely presumptive of what constitutes an exorbitant contingent fee in a particular case. The way is left open in any case to an attorney to come into court on a full showing of all the facts and circumstances, with opportunity to establish that these prima facie percentages do not indicate correctly that the stipulated contingent fee in his case is unlawful due to being unconscionable. The effect is to make a record in the individual case, to determine by the very ad ho6 procedure which plaintiffs assert is the way to attack the problem, after the work of the lawyer has been finished, whether the contingent fee claimed is lawful or unconscionable — that is to say, whether it is in such an amount as to be collectible in an action between attorney and client on the contingent fee retainer agreement. The language of the rule bears no token of an intention to censure the lawyer unless the charge to the client is so large in amount as to be uncollectible as between attorney and client. The scheduling of the graduated scale of percentages in the rule, fair as these percentages are conceded to be for the purposes of the action, concludes nobody. They are simply a procedural means of avoiding the necessity of calling upon every lawyer who files a contingent fee agreement to show what he has done in the case as a basis for determining whether the fee agreement is exorbitant. Plaintiffs have not denied that it is within the power of the Appellate Division to call on all lawyers who have collected contingent fees to do exactly that. They could not deny it in the face of the decision by this court in People ex rel. Karlin v. Culkin (248 N. Y. 465, supra). The matter here claimed to be wrong about the rule is that it calls upon the lawyer to make this showing (if his contingent fee exceeds the scheduled percentages) before rather than after collection of the fee. It could not be denied, even on plaintiffs’ theory ■ of the case, that excessive exactions by lawyers from their clients is a proper subject for investigation and disciplinary action. Unless the work were shortened by presuming that fees within specified limits were lawful, the volume of the task would be too great for any court effectively to perform. By the fee schedule the rule sifts out all except those to which special attention need be given. Some of those will prove to be legitimate and others illegitimate. They will not be branded *114 either way even if they exceed the scheduled percentages, if the lawyer has made special application under the rule, until the court decides, and the attorney will not be censured unless he accepts a fee in an amount which has been found to be unconscionable.
There is no reason on account of which the Appellate Division could not proceed by this practical and equitable rule to attack this insistent problem. If a lawyer believes himself to be entitled to contingent fees in excess of the scheduled percentages, he can provide for them in his contingent fee contract without infraction of the rule, by stating in the retainer agreement that he belives in good faith that the scheduled percentages because of special or extraordinary circumstances will not give adequate compensation, and that application for greater compensation within the amounts provided by his contingent fee agreement will be made to the-court at the conclusion of the litigation or on the settlement of the claim. The preamble to rule 4 acknowledges that the court 16 recognizes the possibility that extraordinary circumstances may exist in a particular case which would make the resulting compensation inadequate. The court will make special allowance in such cases and grant an application for larger compensation.”
These scheduled percentages are, then, of merely presumtive effect, like a burden of proof which pertains to procedure and is not substantive law (Wadsworth v. Delaware, L. & W. R. R. Co., 296 N. Y. 206, 212). It lay within the competence of the First Department under section 83 of the Judiciary Law to adopt rule 4 as a procedural aid in rendering effectual its disciplinary power over attorneys in the case of unlawful contingent fees. The so-called fee schedule merely determines where the burden of proof shall lie in the determination of the censurability of contingent fees in the individual case. Neither plaintiffs nor any segment of the Bar have a vested interest in the exaction of unlawful fees, which is all that this rule is fashioned to prevent, nor can they be heard to say that the Appellate Division is precluded from taking preventive measures for the reason that the client has decided not to litigate the fee. The contention that this is a fee-limiting measure is reduced to an argument that lawyers cannot be disciplined for accepting fees which would be uncollectible in court, *115 if the clients defended on the ground that they are so out of proportion to the value of the work as to be unconscionable.
The rule-making power of the Appellate Divisions in exercising their long-standing ‘ ‘ power and control over attorneys and counsellors at law and all persons practicing or assuming to practice law” (Judiciary Law, § 90, subd. 2) has always been adapted to the exigencies of the times and to the ingenuity of lawyers who are trying to sail too close to the wind. We think that it extended to the adoption of rule 4. In view of the existence of subdivision 2 of section 90 of the Judiciary Law, it is not necessary to decide whether, as part of the Supreme Court which is vested by the Constitution with general jurisdiction in law and equity (N. Y. Const., art. VI, § 1), the Appellate Divisions possess similar powers over attorneys apart from statute.
The judgment appealed from should be reversed, and declaratory judgment entered in favor of the defendants and against plaintiffs, without costs.

 The relevant portions of this rule are as follows:
“ Rule 4.— Contingent Fees in Claims and Actions bob Personal Injury and Wrongful Death.
(a) In any claim or action for personal injury or wrongful death, whether determined by judgment or settlement, in which the compensation of claimant’s or plaintiff’s attorneys is contingent, that is, dependent in whole or in part upon the amount of the recovery, the receipt, retention or sharing by such attorneys, pursuant to agreement or otherwise, of compensation which is equal to or less than the fees scheduled below is deemed to be fair and reasonable. The receipt, retention or sharing of compensation which is in excess of such scheduled fees shall constitute the exaction of unreasonable and unconscionable compensation in violation of Canons 12 and 13 of the Canons of Professional Ethics of the New York State Bar Association, unless authorized by a written order of the court as hereinafter provided.
(b) The following is the schedule of reasonable fees referred to above: either,
(1)
(A) Fifty per cent, on the first one thousand dollars of the sum recovered,
(B) Forty per cent, on the next two thousand dollars of the sum recovered,
*102 (C) Thirty-five per cent, on the next twenty-two thousand dollars of the sum recovered,
(D) Twenty-five per cent, on any amount over twenty-five thousand dollars of the sum recovered; or
(2)
A percentage not exceeding thirty-three and a third per cent, of the sum recovered, if the initial contractual arrangement between the client and the attorneys so provides, in which event the procedure hereinafter provided for making application for additional compensation because of extraordinary circumstances shall not apply.
(c) Such percentages shall be computed on the net sum recovered after deducting taxable costs and disbursements, and expenses of legal, medical, investigative, or other services properly chargeable to the claim or action. But for the following or similar items there shall be no deduction in computing such percentages: Liens, assignments or claims in favor of hospitals, treating doctors, nurses, self insurers or insurance carriers.
(d) In the event that claimant’s or plaintiff’s attorneys believe in good faith that the foregoing schedule (1), because of extraordinary circumstances, will not give them adequate compensation, application for greater compensation may be made upon affidavit with written notice and an opportunity to be heard to the client and other persons holding liens or assignments on the recovery. Such application shall be made to the justice of the trial part to which the action had been sent for trial; or, if it had not been sent to a part for trial, then to the justice presiding at the Trial Term Calendar part of the court in which the action had been instituted; or, if no action had been instituted, then to the justice presiding at the Trial Term Calendar part of the Supreme Court for the county in the First Judicial Department in which the attorneys filing the statement of retainer, pursuant to Rule 4-A, have an office. Upon such application, the justice in his discretion, if extraordinary circumstances are found to be present, and without regard to the claimant’s or plaintiff’s consent, may fix as reasonable compensation for legal services rendered an amount greater than that specified in the foregoing schedule (1), provided, however, that such greater amount shall not exceed the fee fixed pursuant to the contractual arrangement, if any, between the client and the attorneys. If the application be granted, the justice shall make a written order accordingly, briefly stating the reasons for granting the greater compensation; and a copy of such order shall be served on all persons entitled to receive notice of the application.”

 Or, as an alternative, in excess of 33%% of the sum recovered.